IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JAMES BOONE, | : | |
|     Plaintiff, | : | |
| | : | CIVIL ACTION |
| v. | : | No. 22-1601 |
| | : | |
| NEWSWEEK LLC, et al., | : | |
|     Defendants. | : | |

**February 27, 2023**                                                                                   **Anita B. Brody, J.**

### MEMORANDUM

Online news outlet *Newsweek* published a story about a police officer accused of racially profiling a Black man in a restaurant. Embedded in that story was a photograph of a police officer. But the police officer in the photograph, James Boone, was not the police officer accused of racial profiling. Boone brings this action against Newsweek LLC, several related entities, and the reporter who wrote the story (collectively "*Newsweek*") for defamation and false light, claiming that the photograph's appearance in the article falsely implicated him in the incident. *Newsweek* moves to dismiss the Complaint, arguing that Boone failed to plead enough facts to support a reasonable inference that *Newsweek* acted with "actual malice," the demanding standard for public-figure defamation liability. I have jurisdiction under 28 U.S.C. § 1332.

**I.     BACKGROUND**

On April 17, 2021, a Black patron sat in a Vandergrift, Pennsylvania restaurant with his girlfriend and their service dog when a white police officer approached his table.[1] Compl. (ECF

---

[1] All facts are taken from the Complaint and attached exhibits unless otherwise noted. *See Sands v. McCormick*, 502 F.3d 263, 268 (3d Cir. 2007) ("[I]n ruling on a motion to dismiss, a district court relies on the complaint, attached exhibits, and matters of public record."). I treat the factual allegations in the Complaint as true, as I am required to do on a motion to dismiss. *See Mayer v. Belichick*, 605 F.3d 223, 229 (3d Cir. 2010) ("We must accept all factual allegations in the complaint as true, construe the complaint in the light favorable to the plaintiff, and ultimately

1

1-3) Ex. B at 26.[2] The police officer, William Moore, asked the patron for the service dog's registration papers. *Id.* at 26-28, 32. The patron started filming. The recordings show Moore demanding that the patron produce identification, ordering him to leave the restaurant, and calling for backup. *Id.* at 28-31. All the while, the patron asks Moore why he was singled out and accuses him of racial profiling. *Id*. This questioning enrages Moore, who yells that he is "tired of [the patron's] attitude." *Id.* at 29. The videos of this exchange were posted on Twitter, where they racked up nearly a million views. *Id.* at 28, 31.

Nine days later, on April 26, *Newsweek* published an article on its website about the incident. *Id.* at 25.[3] The article, written by *Newsweek* staffer Courtney Brogle, summarized reporting from local news outlets to describe what happened. *Id.* at 25-34. It linked to the viral videos recorded by the patron. And, crucially, it embedded a photograph of a uniformed police officer with the caption: "A Pennsylvania police officer has been put on leave after video of him 'racially profiling' a Black man at a diner went viral." *Id.* at 34. *Newsweek* published the same photograph and caption again in its digital magazine. Compl. (ECF 1-3) Ex. A at 23; Compl. (ECF 1-3) ¶¶ 2-3.

The photograph, however, does not show William Moore, the police officer accused of racial profiling in Vandergrift. Instead, it depicts James Boone, a member of the Philadelphia Police Department's Highway Patrol Unit and the plaintiff here. *Id.* ¶¶ 4, 12. Boone was not involved in the Vandergrift incident, was not in Vandergrift on the day in question, and works for a different police department on the other side of the state. *Id.* ¶¶ 12, 19-20. But he is identifiable

---

determine whether plaintiff may be entitled to relief under any reasonable reading of the complaint.").
[2] Citations to page numbers in ECF documents use the ECF pagination, not the pagination in the original document.
[3] The Complaint says that the article was published on April 17, *see, e.g.*, Compl. (ECF 1-3) ¶¶ 2-3, but the timestamp on the article indicates that it was published on April 26, *see* Compl. (ECF 1-3) Ex. B at 25. Plaintiff's May 5, 2021 letter to *Newsweek* corroborates the April 26 publication date. *See* Compl. (ECF 1-3) Ex. C at 36.

in the photograph: though his face is obscured by a neck gaiter, a nametag with his surname and badge with his badge number are visible. *Id.* ¶ 18.

Boone claims that the publication of the photograph falsely implicated him in the Vandergrift racial profiling incident and upended his life. He and his family members have received texts, emails, and social media messages referencing the *Newsweek* article and—under the erroneous impression that he was involved in the Vandergrift incident—claiming that he "is a racist and unfit officer." *Id.* ¶¶ 27, 30. These messages prompted Boone to seek police protection. *Id.* ¶ 31.

Seeking to set the record straight, Boone's lawyers sent a letter to *Newsweek* on May 5, 2021. *Id.* ¶ 40. The letter explained that Boone was not involved in the Vandergrift racial profiling incident and demanded that *Newsweek* take "appropriate measures to mitigate the harm" from its publication of the photograph. Compl. (ECF 1-3) Ex. C at 36-37. *Newsweek* declined to respond. Compl. (ECF 1-3) ¶ 42. Boone then filed this action for defamation and false light in the Philadelphia County Court of Common Pleas. *Id.* ¶¶ 43-74. *Newsweek* removed the case to federal court. *See* Notice of Removal (ECF 1) ¶¶ 7-25.

**II.    DISCUSSION**

*Newsweek* now moves to dismiss the Complaint under Federal Rule of Civil Procedure 12(b)(6). Def. Motion (ECF 13) at 1. It argues that Boone failed to plead enough facts to support a reasonable inference that *Newsweek* acted with actual malice. Def. Mem. (ECF 13-1) at 1-2. For the reasons explained below, I will deny the motion.

   **A.  Defamation Claim**

To prevail on a defamation claim, the First Amendment requires that public-figure plaintiffs plead—and later, prove—that the defendant acted with "actual malice." *Gertz v. Robert*

*Welch, Inc.*, 418 U.S. 323, 335 (1974); *Curtis Pub. Co. v. Butts*, 388 U.S. 130, 164 (1967) (Warren, C.J., concurring in the result); *New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964).[4] "'Actual malice' is a term of art that does not connote ill will or improper motivation." *McCafferty v. Newsweek Media Grp., Ltd.*, 955 F.3d 352, 359 (3d Cir. 2020). Instead, it means that the publisher acted "with knowledge that [the allegedly defamatory statement] was false or with reckless disregard of whether it was false or not." *Sullivan*, 376 U.S. at 280. Reckless disregard—"the outer limit of actual malice"—means "that the defendant in fact entertained serious doubts as to the truth of the statement or that the defendant had a subjective awareness of probable falsity." *Kendall v. Daily News Pub. Co.*, 716 F.3d 82, 89, 91 (3d Cir. 2013) (internal quotation marks omitted).

This demanding standard reflects an "accommodation between" two "competing concerns": "the need for a vigorous and uninhibited" debate on issues of public importance, "and the legitimate interest in redressing wrongful injury" to reputation. *Gertz*, 418 U.S. at 342. Though defamation cases place these interests at odds, a robust public sphere requires some measure of both. On one hand, "erroneous statement is inevitable in free debate," *Sullivan*, 376 U.S. at 271, and imposing potentially ruinous liability for mere error "runs the risk of inducing a cautious and restrictive exercise of the constitutionally guaranteed freedoms of speech and press," *Gertz*, 418 U.S. at 340.[5] On the other, citizens rely on their good names to participate in public life, and

---

[4] Until *Sullivan*, states had wide latitude to set defamation liability standards without First Amendment guardrails. *See Marcone v. Penthouse Int'l Mag. for Men*, 754 F.2d 1072, 1080-81 (3d Cir. 1985) (summarizing the Supreme Court's reshaping of defamation law from *Sullivan* through *Gertz*). In all other respects, Pennsylvania law still controls. *Id.* at 1077 ("[A] defamation suit fundamentally is a state cause of action."); *Steaks Unlimited, Inc. v. Deaner*, 623 F.2d 264, 270 (3d Cir. 1980) ("Adjudication of a defamation case under Pennsylvania law involves two principal inquiries: (1) whether the defendants have harmed the plaintiff's reputation within the meaning of state law; and (2) if so, whether the First Amendment nevertheless precludes recovery.").

[5] At a broader level, the idea that "debate on public issues should be uninhibited, robust, and wide-open," *Sullivan*, 376 U.S. at 270, is deeply rooted in our First Amendment tradition. *See Dennis v. United States*, 341 U.S. 494, 503 (1951) ("[T]he basis of the First Amendment is the hypothesis that speech can rebut speech, propaganda will answer propaganda, free debate of ideas will result in the wisest governmental policies."); *Associated Press v. United States*,

allowing reputations to be tarnished without recourse could chill that participation. *See id.* at 341 ("[T]he individual's right to the protection of his own good name 'reflects no more than our basic concept of the essential dignity and worth of every human being . . . .'" (quoting *Rosenblatt v. Baer*, 383 U.S. 75, 92 (1966) (Stewart, J., concurring))).[6]

Though the actual malice standard may not lead to a perfect result in every case, it reflects the reality that "First Amendment freedoms need breathing space to survive." *NAACP v. Button*, 371 U.S. 415, 433 (1963); s*ee also Gertz*, 418 U.S. at 341 ("The First Amendment requires that we protect some falsehood in order to protect speech that matters."). It erects a high bar to recovery so that the press and public may comment on the issues of the day without "the pall of fear and timidity" that freewheeling defamation liability would cast. *Sullivan*, 376 U.S. at 278.[7] But it does not categorically shield the press (or anyone else)[8] from accountability for knowingly or recklessly spreading defamatory falsehoods. *Gertz*, 418 U.S. at 341.

---

326 U.S. 1, 20 (1945) ("That Amendment rests on the assumption that the widest possible dissemination of information from diverse and antagonistic sources is essential to the welfare of the public, that a free press is a condition of a free society."); *Whitney v. California*, 274 U.S. 357, 375 (1927) (Brandeis, J., concurring) ("[T]he fitting remedy for evil counsels is good ones."), *overruled by Brandenburg v. Ohio*, 395 U.S. 444 (1969); *Abrams v. United States*, 250 U.S. 616, 630 (1919) (Holmes, J., dissenting) ("[T]he ultimate good desired is better reached by free trade in ideas.").

[6] *See also* Lee C. Bollinger, *The End of* New York Times v. Sullivan*: Reflections on* Masson v. New Yorker Magazine, 1991 SUP. CT. REV. 1, 6 (arguing that defamatory statements "can damage public discourse" by "mislead[ing] the public" and encouraging "those who place a high value on their reputations within the community . . . to forego politics altogether").

[7] The context surrounding the *Sullivan* decision only underscores this point. That case was an appeal from one of a series of costly libel actions against national news outlets for their coverage of the civil rights movement. *See Sullivan*, 376 U.S. at 295 (Black, J., concurring) ("[B]riefs before us show that in Alabama there are now pending eleven libel suits by local and state officials against the *Times* seeking $5,600,000, and five such suits against [CBS] seeking $1,700,000."). The size of these judgments, some members of the Court observed, likely had more to do with "feelings of hostility" towards the national press than any true "appraisal of damages." *Id.* at 294; *see also* Burt Neuborne, *The Gravitational Pull of Race on the Warren Court*, 2010 SUP. CT. REV. 59, 79 ("Libel actions like *Times v Sullivan*, tried before hostile southern juries, threatened to drive national media from covering the extraordinary events in the South during the height of the civil rights movement.").

[8] The institutional press enjoys no special privileges in the law of defamation, and the same liability standards that apply to it apply to other speakers. *Avins v. White*, 627 F.2d 637, 648 (3d Cir. 1980); *Obsidian Fin. Grp., LLC v. Cox*, 740 F.3d 1284, 1291 (9th Cir. 2014) ("[E]very other circuit to consider the issue has held that the First Amendment defamation rules in *Sullivan* and its progeny apply equally to the institutional press and individual speakers."); *cf. Lovell v. City of Griffin*, 303 U.S. 444, 452 (1938) ("The liberty of the press is not confined to newspapers and periodicals. . . . The press in its historic connotation comprehends every sort of publication which affords a vehicle of information and opinion.").

5

In this case, both sides agree that Boone is a public-figure plaintiff subject to the actual malice standard. Pl. Mem. (ECF 16) at 9; Def. Mem. (ECF 13-1) at 4; *see also Coughlin v. Westinghouse Broad. & Cable Inc.*, 780 F.2d 340, 346 n.6 (3d Cir. 1985) (Becker, J., concurring) ("A long line of cases demonstrates that police officers are public figures."). At this early stage, however, Boone need not show actual malice through the "clear and convincing" evidence required to prevail at trial. *Gertz*, 418 U.S. at 342. To survive a motion to dismiss, Boone's Complaint must only plead facts that, taken as true, raise a "reasonable inference" that *Newsweek* acted with actual malice. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).[9]

Boone's burden is heightened, though, by the defamation theory his Complaint advances. Ordinarily, defamation cases arise from a statement—imagine, for example, that *Newsweek* had written: "James Boone is accused of racially profiling a restaurant patron in Vandergrift, Pennsylvania." But *Newsweek* never said that directly. Instead, Boone claims that the placement of his photograph in the article and the caption's generic reference to "[a] Pennsylvania police officer" *implied* that he was involved in the Vandergrift incident. Compl. (ECF 1-3) ¶¶ 18-25; Pl. Mem (ECF 16) at 6-7. A false implication can be defamatory under Pennsylvania law. *Graboff v. Colleran Firm*, 744 F.3d 128, 136 (3d Cir. 2014) ("[D]efamation may be established where a statement, viewed in context, creates a false implication.").[10]

---

[9] As with any motion to dismiss, the court "must accept [the plaintiff's] allegations as true," but may not credit "[c]onclusory assertions of fact and legal conclusions." *Schuchardt v. President of the United States*, 839 F.3d 336, 347 (3d Cir. 2016).

[10] Under Pennsylvania law, defamation plaintiffs must plead and prove, among other things, "the defamatory character of the communication" and "its application to the plaintiff." 42 Pa. Consol. Stat. § 8343(a); *see also Graboff*, 744 F.3d at 135 (listing the elements of a defamation claim under Pennsylvania law). These elements are often contested in defamation by implication cases because implications are ambiguous by nature. In one such case, the Third Circuit found that a news article about a scandal at a fire department, coupled with a photograph of a particular firefighter from that department, created a defamatory implication that the firefighter was involved in the scandal because "a reasonable reader could conclude that the inclusion of [the firefighter's] photograph and name meant to suggest that the text of the article concerned him." *Cheney v. Daily News L.P.*, 654 F. App'x 578, 582 (3d Cir. 2016); *see also Manzari v. Associated Newspapers Ltd.*, 830 F.3d 881, 890 (9th Cir. 2016) ("[A] photograph itself can convey both an implicit and an explicit message and . . . the headline, caption and photograph taken together are also a statement."); Restatement (Second) of Torts § 652E, cmt. b, ill. 2 (1977) ("A is a taxi driver in the city of Washington. B Newspaper

In defamation by implication cases, there is an additional element to the actual malice standard: the plaintiff must show that defendant "either intended to communicate the defamatory meaning or knew of the defamatory meaning and was reckless in regard to it." *Kendall v. Daily News Pub. Co.*, 716 F.3d 82, 90 (3d Cir. 2013). This requirement "ensures that publishers are not held liable for unintentional misstatements or implications, which public figures later claim are defamatory." *Manzari v. Associated Newspapers Ltd.*, 830 F.3d 881, 891 (9th Cir. 2016); *see also Kendall*, 716 F.3d at 91 ("[I]f mere knowledge were sufficient to find defamatory intent, then actual malice could be found no matter how unlikely it is that a listener would interpret the statement as having the defamatory meaning."). Like the standard actual malice requirement, the inquiry is "subjective [in] nature," requiring "some evidence showing, directly or circumstantially, that the defendants themselves understood the potential defamatory meaning of their statement." *Id.* at 93.

The defamatory implication in this case is that Boone was involved in the Vandergrift racial profiling incident. Compl. (ECF 1-3) ¶¶ 18-25. So the court must examine the Complaint to determine whether it pleads facts sufficient to support two inferences. *First*, a variation on the standard actual malice requirement: that *Newsweek* knew the implication that Boone was involved in the Vandergrift incident was false or was reckless about its falsity. *See Kendall*, 716 F.3d at 89. And *second*, the heightened requirement for defamation by implication cases: that *Newsweek* either intended to convey the false impression that Boone was involved in the Vandergrift incident, or

---

publishes an article on the practices of Washington taxi drivers in cheating the public on fares, and makes use of A's photograph to illustrate the article, with the implication that he is one of the drivers who engages in these practices. A never has done so. B is subject to liability to A for both libel and [false light] invasion of privacy."); *Burton v. Crowell Pub. Co.*, 82 F.2d 154, 155 (2d Cir. 1936) (Hand, J.) (noting that "it has long been recognized that pictures may be libels" if they "impugn[] the plaintiff at least by implication, directly or indirectly uttering some falsehood about him"). But the Third Circuit's analysis in *Cheney* was highly fact bound, and defamation by implication is "an area fraught with subtle complexities." *White v. Fraternal Ord. of Police*, 909 F.2d 512, 518 (D.C. Cir. 1990). Because *Newsweek* never briefed the issue of whether the article and photograph satisfy the Pennsylvania defamation elements, I do not reach it here.

7

knew that publishing the photograph would likely convey the false impression that Boone was involved in the Vandergrift incident but recklessly published it anyway. *See id.* at 90-91.

The Complaint relies on three pieces of circumstantial evidence to carry this burden: (1) *Newsweek*'s history of factual errors and deviations from sound journalistic practices; (2) *Newsweek*'s decision to leave the photograph in the article after Boone's lawyers notified them of the error; and (3) the photograph's depiction of Boone's nametag and badge number. *See Schiavone Const. Co. v. Time, Inc.*, 847 F.2d 1069, 1090 (3d Cir. 1988) ("[O]bjective circumstantial evidence can suffice to demonstrate actual malice . . . [and] can override defendants' protestations of good faith and honest belief that the report was true.").[11] Only the third is enough to defeat dismissal at this stage.

First, the Complaint discusses *Newsweek*'s lack of fact-checking and poor journalistic standards. Compl. (ECF 1-3) ¶¶ 36-38. But the Third Circuit has held—in a case involving the same defendant—that "even an extreme departure from professional standards, without more, will not support a finding of actual malice." *McCafferty v. Newsweek Media Grp., Ltd.*, 955 F.3d 352, 359 (3d Cir. 2020) (quoting *Tucker v. Fischbein*, 237 F.3d 275, 286 (3d Cir. 2001) (Alito, J.)). This is because deficient fact-checking or a record of retractions may indicate carelessness, but they do not establish knowledge or recklessness. The inference is weakened even further because the Complaint pleads no facts about the fact-checking or editorial process behind the article at issue.

Just as unhelpful to Boone is *Newsweek*'s decision to leave the photograph in the article

---

[11] The Complaint also says that *Newsweek* "knew and/or acted with a reckless disregard for the fact [Boone] was never accused of racial[] profiling," Compl. (ECF 1-3) ¶ 52, and that it published the photograph "with a high degree of awareness of the probable falsity of the image the photograph conveyed about [Boone]," *id.* ¶ 56. These statements, standing alone, are the sort of bare legal conclusions that the court need not credit. *See Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.").

after Boone's lawyers wrote to the publication. Compl. (ECF 1-3) ¶¶ 39-42. "[A]ctual malice cannot be inferred from a publisher's failure to retract a statement once it learns it to be false." *Pippen v. NBCUniversal Media, LLC*, 734 F.3d 610, 614 (7th Cir. 2013). This is because actual malice is assessed at the time of original publication. *See* Rodney A. Smolla, Law of Defamation § 3:79 (2d ed.); *Sullivan*, 376 U.S. at 286 ("The statement does not indicate malice at the time of the publication.").[12]

But one crucial fact saves the Complaint: Boone's badge number and nametag are visible in the photograph. Compl. (ECF 1-3) ¶ 18. It would be reasonable to infer that anyone reviewing the photograph—including the *Newsweek* staffers writing and editing the article[13]—would have seen those details. And if someone at *Newsweek* saw those details, they would have known two things. First, they would have known (or recklessly disregarded) that the photograph did not depict the police officer accused of racial profiling in Vandergrift. That officer, William Moore, was named elsewhere in *Newsweek*'s article. Compl. (ECF 1-3) Ex. B at 32-33. While "a failure to investigate . . . standing alone, does not constitute actual malice," *McCafferty*, 955 F.3d at 359 (cleaned up); *see also Sullivan*, 376 U.S. at 287 (finding that the publisher's failure to check information against its internal files was not enough to establish actual malice), a publisher may act with reckless disregard for the truth when it notices "internal inconsistencies or apparently reliable information that contradicts its libelous assertions, but nevertheless publishes those statements anyway." *Schiavone Const. Co. v. Time, Inc.*, 847 F.2d 1069, 1090 (3d Cir. 1988). Here,

---

[12] Of course, "[w]hat a person does after an event may be probative of a person's intent at the time of the event." Rodney A. Smolla, Law of Defamation § 3:79 (2d ed.). But the Complaint pleads no facts that plausibly link *Newsweek*'s failure to remove the photograph to its state of mind at the time of publication.

[13] *Newsweek* argues that Boone has failed to "plausibly plead actual malice as to each [d]efendant." Def. Mem. (ECF 13-1) at 8, and that this failure "alone" merits dismissal of the Complaint, Def. Reply (ECF 17) at 3. But it cites no binding authority to support this claim. To survive a motion to dismiss, the Complaint "must contain sufficient factual allegations so as to state a facially plausible claim for relief." *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010). Boone need not possess, before discovery has begun, detailed knowledge of *Newsweek*'s internal editorial procedures to meet that burden.

no investigation was required—the contradictory pieces of information were contained in the published photograph and article themselves. *See Williams v. Roc Nation, LLC*, No. 20-3387, 2020 WL 6158242, at *6 (E.D. Pa. Oct. 21, 2020) (Robreno, J.).

Second, they would have known that any viewer of the photograph could identify the police officer it depicted. Publishing a photograph of an identifiable police officer in an article about another police officer's misconduct likely conveys the false impression that the identifiable officer was involved in the misconduct.[14] And, as discussed above, publishing the photograph despite the contradictory information in the article itself may reflect reckless disregard for the truth. The fact that the photograph depicted Boone's nametag and badge number therefore gives rise to a reasonable inference that *Newsweek* (1) knew that Boone was not involved in the Vandergrift incident or acted in reckless disregard of that fact, and (2) knew that publishing the photograph would likely convey the false impression that Boone was involved in the Vandergrift incident but recklessly published it anyway.

*Newsweek* is right about one thing: the actual malice standard protects speakers from liability for careless error. Def. Reply (ECF 17) at 2; *see Masson v. New Yorker Mag., Inc.*, 501 U.S. 496, 510 (1991) ("Mere negligence does not suffice."); *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968) ("[R]eckless conduct is not measured by whether a reasonably prudent man would have published."). With the benefit of discovery, the finder of fact may conclude that *Newsweek*'s conduct falls short of reckless disregard for the truth. But if *Sullivan* and its progeny truly reflect an "accommodation between [the] competing concerns" of open debate and reputational protection, *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 342 (1974), some plaintiffs must clear the

---

[14] While not necessarily probative of *Newsweek*'s state of mind at the time of publication, the Complaint alleges that many people *did* in fact get the false impression that Boone was involved in the Vandergrift incident. *See* Compl. (ECF 1-3) ¶¶ 27-32.

high bar those cases set. Because Boone's Complaint pleads enough facts to support a reasonable inference that *Newsweek* acted with actual malice, I will deny *Newsweek*'s motion to dismiss the defamation claim.

### B. False Light Claim

Like defamation claims, "the false-light tort requires actual malice." *McCafferty v. Newsweek Media Grp., Ltd.*, 955 F.3d 352, 360 (3d Cir. 2020). "Pennsylvania . . . courts consistently apply the same analysis to both types of claims when the causes of action are based on the same set of underlying facts," as they are here. *Graboff v. Colleran Firm*, 744 F.3d 128, 137 (3d Cir. 2014). Because I have already found that Boone's Complaint pleads enough facts to support a reasonable inference that *Newsweek* acted with actual malice, I will deny *Newsweek*'s motion to dismiss the false light claim.

### III. CONCLUSION

For the reasons discussed above, *Newsweek*'s motion to dismiss will be denied. An appropriate order follows.

s/ANITA B. BRODY, J.
ANITA B. BRODY, J.